

# UNITED STATES OF AMERICA
## MERIT SYSTEMS PROTECTION BOARD
### DALLAS REGIONAL OFFICE

BONITA S. PERRY,

    Appellant,

  v.

DEPARTMENT OF VETERANS
  AFFAIRS,

    Agency.

DOCKET NUMBER
DA-0432-17-0313-I-2

DATE: October 22, 2018

Edward L.D. Smith, Esquire, Mobile, Alabama, for the appellant.

Brandi M. Powell, Esquire, New Orleans, Louisiana, for the agency.

## BEFORE
Patrick J. Mehan
Administrative Judge

## INITIAL DECISION

## INTRODUCTION

  Bonita Perry appealed the agency's decision to remove her from her position as a Vocational Rehabilitation Counselor (VRC), GS-0101-11, in the Department of Veterans Affairs, New Orleans Regional Office, effective April 16, 2017, for unacceptable performance under 5 U.S.C. chapter 43. Initial Appeal File (IAF1)[1], Tab 1 at 12. I dismissed the appellant's original appeal without prejudice to refiling and it was automatically refiled by the Board's

---

[1] The file for appeal DA-0432-17-0313-I-1 is referenced as IAF1 and the file in this appeal is referenced as IAF2.

Dallas Regional Office on February 16, 2018.  The Board has jurisdiction to hear this appeal pursuant to 5 U.S.C. § 4303(e), 5 U.S.C. § 7701, and 5 C.F.R. § 432.106.  At the appellant's request, I conducted a video-conference hearing on April 24, 2018. IAF2, Tab 16; Transcript of Hearing (Trans.).

For the reasons that follow, the appellant's removal is AFFIRMED.

## FINDINGS AND ANALYSIS

Background

The agency employed the appellant as a VRC in its New Orleans Regional Office.  This regional office consisted of approximately 200 employees and managed nearly one-billion dollars of veterans' benefits on an annual basis. Trans. Bologna.  The goal of the office, and job of a VRC, is to help the most seriously disabled veterans gain employment or, alternatively, to gain the highest level of functioning so that they can live their best life. *Id.*  The agency accomplishes this by awarding veterans' benefits to those that qualify.

The appellant started her career with the agency in 2006, as a Vocational Rehabilitation Specialist.  She explained that this position and the VRC performed the same or similar duties.  Trans.  She was moved from Fort Polk, LA, to New Orleans in 2013 after she requested a transfer.

The appellant's supervisor, and the agency official that administered the performance improvement period (PIP), Carolyn Pannell,[2] was considered a subject matter expert on issues related to veterans' benefits and served on panels across the agency because of expertise.  Pannell explained that VRCs shepherd cases through the counseling process with the end goal of identifying and providing benefits administered by the agency, and then by maintaining contact and oversight of the veterans while they receive benefits.  She testified that this

---

[2] Carolyn Pannell's maiden name was Seymour, and various documents in the record reflect Carolyn Seymour or Carolyn Seymour-Pannell.  For clarity, I refer to Pannell by her married name, "Pannell."

process involved several steps.  The evaluation and planning (E/P) status is when a VRC has met with the veteran but there are other things needed in the file before the veteran may be qualified for service or other benefits.  Trans. Pannell. She explained that, once the VRC meets with a veteran for a case assigned to her, and that case moves to the E/P status, a VRC is expected to document the file and make sure everything needed to make an entitlement decision is in the file.  The ultimate goal is to get the veteran in a plan of services, which could mean the veteran is provided on the job training, an academic plan, or vocational training. *Id.*  Once a positive entitlement decision is made, the VRC must stay in contact periodically with the veteran.  *Id.*

Pannell noticed the appellant's performance slipping in fiscal year 2015, and her performance in 2016 was even more of a problem.  She explained that during this time the appellant had received additional training and performance counseling, but that her performance was not improving.[3]  Therefore, Pannell decided, due to the appellant's performance deficiencies, to place her on a PIP. Pannell delivered the PIP to the appellant and her union representative, Angela Raymond, on October 5, 2016.[4]  IAF1, Tab 10 at 27-32.  In the PIP, Pannell outlined that the appellant's performance was unacceptable in critical elements 1, 2, and 5.  She explained the observed poor performance, and included the performance standards and critical elements with the PIP notice.  The PIP was designed to last 90 days, but the agency extended the PIP until the end of January 2017, or a total of 111 days, to account for leave used by the appellant during the PIP.  *See* IAF1, Tab 17.  At the end of the PIP, Pannell determined that the

---

[3] The appellant appeared to claim that she did not receive certain training when she moved to the New Orleans regional office in 2012. Nevertheless, the appellant failed to explain how this alleged training deficiency was related to her failure during the PIP. As the appellant explained, she had performed at a fully successful level for nearly all of her 10 year career, in which she performed the same or similar tasks.

[4] The PIP letter was dated September 29, 2016. IAF1, Tab 10 at 27.

appellant had failed to improve her performance to a successful level and she drafted the PIP summary which set forth the appellant's deficient performance. IAF1, Tab 10 at 23-26. This document was created on January 31, 2017, and Pannell retired later that same day. The appellant claims she did not receive this document on the January 31, 2017. [5] Nevertheless, based upon the documentation created by Pannell, and the PIP summary document, the appellant's second-level supervisor, Debbie Biagioli, the Assistant Director of the New Orleans Regional Office, issued a proposed removal for unacceptable performance during her PIP. Mark Bologna, the Director of the New Orleans Regional Office, considered the appellant's oral and written reply, and the evidence of her unacceptable performance, and he decided to uphold the removal. IAF1, Tab 10 at 12. The removal was effective April 16, 2017. *Id.* This timely appeal followed.

In general, the appellant does not dispute the charged unacceptable performance in the critical elements set forth in the agency's notice of proposed removal. IAF1, Tab 10 at 18-23; IAF2, Tab 18. Rather, she contends that the agency failed to adequately explain the performance standards and that the appellant failed to "perceive and understand" what was required for successful performance in her position. *Id.* Further, the appellant contends the agency failed to provide her an adequate opportunity to improve her performance because it failed to provide her training and feedback during the PIP, and it failed to offer her a "fresh start" as contemplated by the PIP. The agency contends that it met its requirements under the PIP. The agency contends that the appellant rejected the offered training, and that Pannell met with the appellant and provided specific feedback to help assist her in raising her performance to an acceptable level.

---

[5] The appellant appears to claim that the agency was barred from issuing a proposed removal once Pannell retired. She cited to no legal authority to support this claim, and I find that her claim is without merit.

Burden of Proof

An unacceptable performance action brought by the agency under chapter 43 must be sustained if the agency's decision is supported by substantial evidence. Substantial evidence is a lower evidentiary standard than preponderant evidence. *Compare* 5 C.F.R. § 1201.4(p) *with* 1201.4(q). The Board defines substantial evidence as the degree of relevant evidence that a reasonable person, considering the record as a whole, might accept as adequate to support a conclusion, even though other reasonable persons might disagree. *Id.* Substantial evidence "is a deferential standard of review." *See Adamsen v. Department of Agriculture*, 116 M.S.P.R. 331, ¶ 7 and n.4 (2011). The U.S. Court of Appeals for the Federal Circuit has explained the "substantial evidence standard determines whether the decision could reasonably have been made, not whether it was correctly made." *Merck and Cie v. Gnosis SPA*, 808 F.3d 829, 840 (Fed. Cir. 2015). To sustain an action based on substantial evidence, there must be "more than a mere scintilla of evidence," but a quantum "less than the weight of evidence" is all that is required. *See Jones v. Department of Health & Human Services*, 834 F.3d 1361, 1366 (Fed. Cir. 2016). Under this deferential standard, if the record supports several reasonable, yet contradictory, conclusions, a decision should not be overturned simply because one reasonable conclusion was selected over another. *See In re Jolley*, 308 F.3d 1317, 1320 (Fed. Cir. 2002); 5 C.F.R. § 1201.4(p).

Applicable Law

Unacceptable performance in a chapter 43 action means performance which fails to meet one or more critical elements of the performance standards for the employee's position. 5 U.S.C. § 4301(3); 5 C.F.R. § 432.103(h). Once an employee's performance is shown to be unacceptable, even in just one critical element, the Board lacks authority to review the agency's decision to take a

performance-based action, such as demotion or removal. *See e.g., Lee v. Department of Labor*, 110 M.S.P.R. 355, ¶ 12 (2008).

The agency must establish the following elements by substantial evidence: (1) the performance standards were valid; (2) the agency communicated to the employee the performance standards and critical elements of the position; (3) the agency warned the employee of the inadequacies of her performance during the appraisal period and gave her a reasonable opportunity to improve; and (4) the employee's performance remained unacceptable in at least one critical element.[6] 5 U.S.C. §§ 4302-4304; *see also White v. Department of Veterans Affairs*, 120 M.S.P.R. 405, ¶ 5 (2013), *Fernand v. Department of the Treasury*, 100 M.S.P.R. 259, ¶ 8 (2005), *aff'd* 210 Fed.Appx. 992 (Fed. Cir. 2007).

<u>The performance standards for the VRC position were valid and the appellant's performance remained deficient in several critical elements during the PIP.</u>

The agency must prove that its action was based on valid performance standards. *Boyd v. Department of the Navy*, 88 M.S.P.R. 435 (2001); *Neal v. Defense Logistics Agency*, 72 M.S.P.R. 158 (1996). When the Board reviews an agency's performance standards, it must determine whether the standards accord with the requirements of 5 U.S.C. § 4302(b)(1) and the guidelines set forth by OPM.   5 C.F.R. § 430.203.   The inquiry is case specific. *Id.; Jackson v. Department of Veterans Affairs*, 97 M.S.P.R. 13, ¶¶ 14-15 (2004).

In this appeal, the agency based its removal action upon the performance deficiencies observed in critical elements 1, 2, and 5, during the PIP period. Under 5 U.S.C. § 4302(b)(1), performance standards and critical elements must permit, to the maximum extent feasible, accurate evaluation of job performance on the basis of objective criteria related to the position. *Eibel v. Department of*

---

[6] The appellant conceded that she was evaluated under a performance standard that was part of a performance appraisal system approved by OPM. Therefore, it is assumed that the agency established this element of its case. IAF2, Tab 15 at n. 3.

*the Navy*, 857 F.2d 1439, 1441 (Fed. Cir. 1988). A performance standard must be a written "expression of the performance threshold(s), requirement(s), or expectations(s) that must be met to be appraised at a particular level of performance ... [and] include ... quality, quantity, timeliness, and manner of performance." 5 C.F.R. § 430.203. Performance standards may be more or less objective depending upon the job measured, but they must be sufficiently specific to provide a firm benchmark toward which the employee must aim her performance, and not an elusive goal which the agency may find she met or failed to meet at its pleasure. *Donaldson v. Department of Labor*, 27 M.S.P.R. 293, 298 (1985). An agency may make this required showing through the standards themselves, or by giving content to the standards by informing the employee of specific work requirements through other methods, including placing the employee on a PIP. *See Diprizio v. Department of Transportation*, 88 M.S.P.R. 73, 78 (2001); *Greer v. Department of the Army*, 79 M.S.P.R. 477, 484 (1998); *Dancy v. Department of the Navy*, 55 M.S.P.R. 331, 335 (1992); *Baker v. Defense Logistics Agency*, 25 M.S.P.R. 614, 617 (1985), *aff'd*, 782 F.2d 1579 (Fed. Cir. 1986).

To show that a performance standard is valid, an agency must also demonstrate that the standard is reasonable, realistic and attainable. *Johnson v. Department of the Army*, 44 M.S.P.R. 464, 466-67 (1990). However, the Board will defer to managerial discretion in determining what employees must do in order to perform acceptably in their positions. *See Lee*, 115 M.S.P.R. 533, ¶ 29. Thus, an agency is free to set its performance standards as high as it thinks appropriate, provided those standards are objective and meet the other requirements of 5 U.S.C. § 4302(b)(1). *See Jackson*, 97 M.S.P.R. 13, ¶ 14. Accordingly, the focus of the Board's inquiry in a chapter 43 appeal is whether the standards set by the agency "measure the performance of the job in question on the basis of the objective criteria set forth by the agency[.]" *Id.* Provided this

standard is met, the Board will defer to the agency's structuring of an employee's performance standards. *Id.*

In evaluating the performance standards, I note that the agency has established a pass-fail system. The agency's standards establishes a minimum level of performance to achieve fully successful rating, and performance that falls below this level is unacceptable. *See* IAF1, Tab 10 at 33-35, 38. The standards at issue in this appeal are all measured by objective criteria. First, critical element 1, "Production" has three sub-elements. The first sub-element is "number of positive outcomes" which requires a VRC to achieve a minimum of 15 positive outcomes each year. The standards are explained:

> **Number of Positive Outcomes** is a combined measure of the number of Chapter 31 Employment Rehabilitations, Continuing Education Rehabilitations, Independent Living Rehabilitations and Maximum Rehabilitation Gains (MRGs: employed, but not suitably employed or employable) and Chapter 18 and 35 Rehabilitations achieved during a 12 month rating period.

*Id.* at 33 (emphasis original). The performance standard specifically addresses how performance is measured for a period less than 12 months: "[t]his standard should be prorated for the rating period if the employee has less than 12 months in the position." *Id.* Therefore, to achieve fully successful performance during the PIP, the appellant needed to achieve a minimum of 3 positive outcomes. The second sub-element of production required the appellant to maintain 85% of her cases in an active status. The standard explains that active status is the percentage of active cases in proportion to the employee's total caseload, and the standard defined what was required for a case to be considered in "active status."[7] In other words, the percent of active cases is determined by dividing the total

---

[7] Cases in applicant status (Chapter 31 and Chapter 36) < 60 days; cases in evaluation and planning status ≤ 180 days; cases in extended evaluation status ≤ 365 days; cases in independent living statuses ≤ 730 days; cases in rehabilitation to employability status in receipt of pay or with a no pay status < 270 days; cases in job ready status ≤ 545 days; cases in interrupt status ≤ 180 days. IAF1, Tab 10 at 33.

active cases by the total caseload of the employee. *Id.* The final sub-element of the critical element of production required the appellant to produce 14 job ready decisions for the year, or 3.5 during the PIP.[8] This sub-element measures the total number of job ready determinations made by the employee during the rating period.

Critical element 2, "Timeliness," is similarly based on objective measures of performance. The three sub-elements required the appellant to achieve an average number of days for her caseload when measuring: 1) days in evaluation and planning status (105 days/average); 2) days to entitlement decision (40 days/average); and, 3) Chapter 36 days in applicant status (60 days/average). *Id.* at 35.

Critical element 5, "Program and Data Integrity" measured the quality of the appellant's work, but in an objective manner. This standard required the appellant to comport her work to specific agency policy and procedures set forth in the performance standard. IAF1, Tab 10 at 38. The appellant was allowed no more than 3 instances of failing to meet to policy or directive requirements, or no more than one incident of failure to comply with policy if it resulted in a significant negative impact on a veteran for a performance year. *Id.*

I find that the performance standards were sufficiently objective and precise so that the appellant had a firm benchmark to which she could aim her performance. Here, the performance numbers were readily calculable with case data that was available to the appellant. Pannell explained that the data elements of a VRC's performance were tracked, and available to the appellant, through an agency database called Corporate Winners. Trans. She explained that Corporate Winners is a web-based system that would show cases assigned to a VRC, the number of times a VRC closed out a case, the reason code given when the case

---

[8] For this sub-element, the performance standard specifically states that the number is prorated for periods of evaluation less than 12 months. IAF1, Tab 10 at 34.

was closed, and the aggregate positive outcomes and other measures of the VRC's performance. *Id.* In the written performance standards, the agency explained how a VRC attained the various case status elements which would credit a case for inclusion within a specific category. *Id.* It was these categories, taken in the aggregate, or as a percentage of overall caseload, which led to the performance numbers within the production critical element. Timeliness was a measure of how quickly these varying case statuses were achieved. Program and data integrity measured the quality of the work. To the extent that program and data integrity was the most subjective standard, the agency provided an extensive list of policies, procedures, and directives that governed the VRC's work, and provided a meaningful measure to attain.

I have reviewed the agency's documentation in the form of reports from the Corporate Winners database, IAF1, Tab 17, Subtab 4f, Parts A & B, and it shows that the other employees supervised by Pannell met the production and timeliness standards during this same period, and without the benefit of a reset time clock for their cases. Therefore, because the agency showed that a majority of employees working for Pannell during the relevant time period were able to achieve the performance standards, I do not find the performance standards were unduly strict or unreasonable. *See Thomas v. Department of Defense*, 95 M.S.P.R. 123, ¶ 6 (2003), *aff'd* 117 F.App'x 722. (Fed. Cir. 2014).

The appellant appears to contend the agency failed to show, with respect to the timeliness critical element, that it was fair or achievable. The appellant testified that she had a lot of old case files in her office, and that she could not achieve the required performance unless the agency granted her a "fresh start" and zeroed out her workload. First, the appellant incorrectly characterizes what the PIP states with respect to her old caseload and timeliness. The PIP states that her timeliness on previously assigned cases "will start over and you are expected to meet the timeliness numbers outlined in your performance standards. You will be expected to work the oldest cases in your inventory and manage the new

incoming applicant cases as well." IAF1, Tab 10 at 29. Therefore, the agency never promised the appellant that it would wipe her entire caseload out, so that she could start from scratch at the beginning of her PIP. The appellant failed to establish that the timeliness critical element was unreasonable because the agency required her to improve her timeliness numbers to a successful level during the PIP. The Board has held that when the performance metrics are in the nature of ongoing tasks, they are not rendered unreasonable by a shortened performance appraisal period. *Lee*, 115 M.S.P.R. 533, ¶ 32. In this appeal, timeliness standards for each sub-element are an average of all cases (including old) to cases moved through the agency processes. This means that the more numerous the appellant cases (including old cases), the harder it was to raise the average performance number. However, these cases were all previously assigned to the appellant and should have been in various stages of completion because they were part of her ongoing tasks as a VRC. Therefore, even considering that it may have been a difficult task to raise her average performance numbers with respect to timeliness, I find that the appellant has failed to show that the standard was unreasonable.

Therefore, after considering the record as a whole, I find that substantial evidence shows the performance standards were objective and provided the appellant a firm benchmark upon which to aim her performance. The agency also established by substantial evidence that the standards were reasonable and attainable. Consequently, I find that the agency established that its performance standards were valid.

The agency's burden of providing evidence of the appellant's unacceptable performance for a critical element can be met largely by submissions of documentation through the charges and the appellant's working papers. *See Fernand*, 100 M.S.P.R. 259, ¶ 10. The proposal notice, moreover, can constitute valid proof of an agency's charges, where the notice is not merely conclusory, but sets forth in detail an employee's errors and deficiencies, and where the notice is

corroborated by other evidence. *Id.*; *Gill v. Department of the Navy*, 34 M.S.P.R. 308, 311 (1987). Specifications in a notice of proposed removal under chapter 43 that are sufficiently detailed to be disputed by the appellant, if she so desires, and are not contradicted, may be considered as evidence. *DePauw v. U.S. International Trade Commission*, 782 F.2d 1564, 1566-67 (Fed. Cir. 1986), *cert. denied* 479 U.S. 815.

In this appeal, the agency produced a summary of the appellant's performance at the end of the PIP period and a proposed removal with specific claims of unacceptable performance. IAF1, Tab 10 at 22-26. Pannell corroborated these findings with sworn testimony at the hearing. With respect to the production critical element, she explained that the appellant did not attain any positive outcomes during the PIP, her percentage of active cases fell well below the required 85% (34.6% actual performance), and the appellant produced no job ready decisions during the PIP. Trans. Pannell; IAF1, Tab 17, Subtab 4f, Part B. She explained that she compiled this data from the Corporate Winners database, and she knew that the appellant had no production for the positive outcomes and job ready decisions elements because her name was not included on the report. She testified, without rebuttal, that if an employee achieves no production for these elements, that their name is excluded from the report. The appellant testified that the agency's evidence from the Corporate Winners' database, showing that she did not have a single positive outcome during the PIP, may have been incorrect. She claimed the agency's numbers may be wrong because there was no "adjustment made." Trans. 239. She testified that she thought she may have had 2 positive outcomes during the PIP. *Id.* The appellant failed to explain how any purported failed adjustment would have resulted in the incorrect reporting of her positive outcome numbers. Moreover, even crediting her testimony that she had 2 positive outcomes, this still fell below the required performance. Therefore, I find the agency established that the appellant failed to achieve successful performance in critical element 1.

With respect to critical element 2, the data submitted by the agency shows that the appellant achieved successful performance in the sub-element of days in E/P, with an average of 95 days, which met the required 105 days average. However, the agency contended that the appellant failed the following two sub-elements with an average of 84 days (standard of 40 days) for the average days to an entitlement decision, and 275 days (standard of 60 days) for the average days of Chpt. 36 applicants in applicant status.   The agency produced the appellant's aggregate caseload report for all pending cases during the PIP.  IAF1, Tab 17, Subtab 4f, Part C.  This report shows that, for purposes of timeliness, her case receipt dates were restarted and measured from the date of the PIP, *i.e.*, her cases were "zeroed out" on October 5, 2016.  The report shows that her cases were pending an average of 84 days before an entitlement decision was made.[9]  The agency also contends that the appellant was not successful with respect to the third sub-element, timeliness for chapter 36 applicants.  Pannell explained that chapter 36 applicants are veterans, or dependents of veterans, who seek educational benefits but are not disabled.  Trans. 37.  However, the agency failed to explain why this sub-element was evaluated for the PIP.  The performance standard stated:

> a minimum of 12 cases must have been assigned to the VRC as part of their workload during the rating year to measure performance on this element.  If insufficient cases are assigned, this elements will not be rated or factored into the overall performance in any way.

IAF1, Tab 10 at 35.  As Pannell noted, the appellant had several chapter 36 cases assigned to her during the PIP.  The agency's workload spreadsheet also shows that the appellant had 2 chapter 36 cases assigned to her during the PIP.  Even

---

[9] This report showed that several of the appellant's cases were moved to the E/P stage, or were closed when veterans failed to appear for scheduled meetings.  The agency failed to provide further explanation of this report, but it was not specifically challenged by the appellant, except for her incorrect contention that the timelines were not restarted to the PIP period.

accounting for a prorated share during the PIP (12/4=3), which the performance standard does not provide for specifically in chapter 36 cases, the agency failed to show that it assigned her enough cases that it was entitled to rate her on this sub-element. Therefore, based on the explicit caveat found in the critical element, I find that the agency erred in determining that the appellant failed this sub-element.

In addition, where an appellant's performance was unacceptable on one or more, but not all, components of a critical element, the agency must show substantial evidence that the appellant's performance warranted an unacceptable rating on the element as a whole. *Lee*, 115 M.S.P.R. 533, ¶ 36 (citing *Adkins v. Department of Housing & Urban Development*, 781 F.2d 891, 895 (Fed. Cir. 1986); *Shuman v. Department of the Treasury*, 23 M.S.P.R. 620, 628 (1984)). The evidence the agency may submit to satisfy its burden of proof on this point includes evidence that the employee knew or should have known the significance of the sub-element or sub-elements at issue and evidence showing the importance of the sub-element or sub-elements in relation to the duties and responsibilities with which the critical element as a whole is concerned. *Id.* The agency established that the appellant failed one of the three sub-elements to the timeliness critical element. However, it failed to introduce any evidence to explain why failing the second sub-element, the average days to entitlement decision, was so serious that its failure warrants a failure of the overall critical element. It also failed to introduce any evidence that the appellant knew, or should have known, that this sub-element was so critical to her duties and responsibilities that failure would warrant the failure of the overall timeliness critical element. Therefore, I find that the agency failed to prove by substantial evidence that the appellant failed critical element 2.

With respect to critical element 3, the agency set forth specific instances of unacceptable performance in its PIP summary. The agency also submitted evidence of Pannell's communication with the appellant with respect to these

performance deficiencies.   Pannell testified that the appellant's failure was mainly the result of her failure to properly document the veterans benefit file. She explained that this was significant because other employees could not view the file and tell where it was in processing.   Further, with respect to several instances during the PIP, the appellant's failure to properly document the file resulted in delayed educational benefits for veterans.   The agency documented more than 3 deficiencies[10], and these were not contested by the appellant. Therefore, I find that the agency submitted substantial evidence that the appellant's performance was unacceptable for critical element 5.

The agency communicated the performance standards and critical elements of the VRC position to the appellant.

It is a substantive right of the appellant to be made aware of the critical elements and performance standards by which her performance will be evaluated by the agency at the beginning of the appraisal period which forms the basis of the adverse action. *Weirauch v. Department of the Army*, 782 F.2d 1560, 1563 (1986).   The agency established that the appellant received notice of the performance standards, and the critical elements of her position, when she was counseled regarding her unacceptable performance. *See* IAF1, Tab 10 at 27.   The appellant performed under the performance standards at issue in this appeal since October 1, 2015. *Id.*   At the beginning of the PIP, the agency provided the appellant with written notice of observed deficiencies in her performance and how they related to the critical elements of her position. *Id.* at 27-32.   The agency warned the appellant that if her performance did not improve by the end of the 90-day PIP, that she would be subject to an adverse action, including removal. *Id.*

---

[10] It appears the agency allowed the appellant the full-year allotment of errors when evaluating the PIP, as the 3 error standard is applied to the entire performance year.

The appellant contended that she did not accurately perceive the standard to which she had to perform under the PIP.  The appellant claimed that there "[was] some confusion about what numbers I was supposed to meet in relation to my performance standards ... [t]he document indicates what percentage I was to meet for a 12 month period but this does not indicate what I was to meet for my 90 day PIP period." IAF1, Tab 17, Subtab 4C, Part A.  The appellant contended that the PIP did not specifically explain the production, timeliness, or quality that was required during the PIP, as opposed to a full-year.  Nevertheless, the appellant testified at hearing that she understood her performance standards. Trans. 235.  The performance standard itself explicitly stated that performance numbers are prorated when considering an evaluation period less than a year, *e.g.*, for a 3 month (quarter) used in a PIP.  Moreover, the appellant's performance standards were based on objective metrics that are tallied from the agency's workload database.   The appellant provided no explanation of why she was unable to tally the expected level of performance for one-quarter of a year, from a performance standard for an entire year.  There is no evidence that the appellant ever raised any concerns about her standards being imprecise with Pannell during the PIP meeting, or at any time during the PIP period.   Hence, I find the appellant's claim that the agency failed to communicate her performance standards at the beginning of the PIP period is not supported by the record evidence.  Consequently, based on the record in this appeal, I find that the agency established that the appellant was aware of her performance standards, and the critical elements for which she failed to meet successful performance.

The agency demonstrated that the appellant was provided an opportunity to improve her performance during the PIP.

In chapter 43 performance based actions, the opportunity to improve is a substantive right. *Adorador v. Department of the Air Force*, 38 M.S.P.R. 461, 464 (1988).  The agency must prove by substantial evidence that such an

opportunity was afforded.    *Id.* (citing *Sandland v. General Services Administration*, 23 M.S.P.R. 583, 587 (1984)).    The Board has noted that an employee's right to a meaningful opportunity to improve is one of the most important substantive rights in the entire chapter 43 performance appraisal framework. *Zang v. Defense Investigative Service*, 26 M.S.P.R. 155 (1985).

In determining whether an agency has afforded an employee a reasonable opportunity to demonstrate acceptable performance, relevant factors include the nature of the duties and responsibilities of the employee's position, the performance deficiencies involved, and the amount of time which is sufficient to enable the employee with an opportunity to demonstrate acceptable performance. *Lee*, 115 M.S.P.R. 533, ¶ 32 (citing *Macijauskas*, 34 M.S.P.R. 564, 566 (citations omitted)).    Generally, a 30-day PIP can satisfy an agency's obligation to provide an employee with a reasonable opportunity to demonstrate acceptable performance.    *Id.* (citing *Melnick v. Department of Housing & Urban Development*, 42 M.S.P.R. 93, 101 (1989), *aff'd*, 899 F.2d 1228 (Fed. Cir. 1990) (Table)).

Here, the appellant was provided 111 days to perform under the PIP.    The appellant's errors were obvious, with respect to critical element 1, because the appellant's observed deficiencies were that she did not produce work that achieved any measurable results.    Moreover, the errors, with respect to critical element 5, program and data integrity, were obvious errors of omission with respect to her failure to properly document case files. The appellant was afforded an opportunity to work on her existing case load during the PIP, and the agency continued to assign her cases, which provided her ample cases to achieve the results required under the PIP.    The data submitted by the agency shows that other VCRs were able to achieve the requisite metrics with respect to critical element 1 during the quarter that encompassed the appellant's PIP.    Moreover, Pannell testified that she helped the appellant with additional techniques and methods to help her perform successfully.    Therefore, the agency showed that the

PIP period in this instance was sufficient for the appellant to demonstrate successful performance.

The agency is required by regulation to offer the appellant assistance in improving her performance as part of her opportunity to demonstrate acceptable performance. 5 C.F.R. § 432.104. In general, there is no mechanical requirement regarding the form this assistance must take. *Towne v. Department of Air Force*, 120 M.S.P.R. 239, 249 (2013) (citing *Goodwin v. Department of the Air Force*, 75 M.S.P.R. 204, 208 (1997); *Gjersvold*, 68 M.S.P.R. 331, 336)).[11] The Board has also held Chapter 43 does not impose upon the agency a general requirement to provide formal training to the employee during her PIP. *Corbett v. Department of the Air Force*, 59 M.S.P.R. 288, 290 (1993) (citing *Macijauskas v. Department of the Army*, 34 M.S.P.R. 564, 569 (1987), *aff'd* 847 F.2d 841 (Fed. Cir. 1988) (Table)).

However, if an agency promised the employee assistance during a PIP and both fails to and otherwise prejudices the appellant or hinders her chances to succeed, then the agency does not meet its burden of proving that it provided the employee with an opportunity to improve. *Id.* Moreover, the Board has held that an agency fails to afford a reasonable opportunity to improve where, among other things, the appellant did not receive promised supervisory assistance. *Thompson v. Department of the Army*, 122 M.S.P.R. 372, ¶ 20 (2015) (citing *Thompson v. Farm Credit Administration*, 51 M.S.P.R. 569, 579 (1991); *Adorador*, 38 M.S.P.R. at 464-66).

The appellant contends that the agency did not provide her the specific training outlined in the PIP, her supervisor failed to meet with her in accord with the PIP, and she did not receive written feedback on her performance. The PIP

---

[11] The appellant also contended that the feedback she received was insufficient because it did not provide her information as to her performance progress during the PIP. However, in *Gjersvold*, the Board rejected a similar argument. 68 M.S.P.R. at 336.

document stated the agency would provide specific formal training to the appellant during the first 15 days of the PIP, and it also provided that the appellant's supervisor would meet regularly with the appellant, and provide her written feedback on her work. The PIP read in pertinent part:

> You will be given 90 days to demonstrate fully successful performance. We have mutually agreed for the first 15 days of this plan you will receive training on scheduling cases, filing documents in the CER, and completing 1902 B and 1902N narratives. In order to demonstrate successful performance you will be required to meet the following standard in the last 75 days of your performance improvement plan. ...
>
> On the first day after your two weeks of training you will be provided a listing of all the active cases assigned to you by category. Your timeliness on these cases will start over and you are expected to meet the timeliness numbers outlined in your performance standards. You will be expected to work the oldest cases in your inventory and manage the new incoming applicant cases as well.
>
> **Training:**
>
> 1. During the first fifteen days of your performance improvement plan you will receive extensive one-on-one retraining on the necessary information to be successful on the critical elements outlined above with me. This training will include:
>
>    - Assignment and timely completion of Job Support Tools for VRCs. These trainings are focused on synthesis of the evaluation, case management, recordkeeping, and customer service skills. The courses are as follows:

> | Duty 2 | Conduct Evaluation and Planning |
> |--------|----------------------------------|
> | Duty 3 | Develop Rehabilitation and Planning |
> | Duty 4 | Provide Case Management Services |
> | Duty 5 | Implement Employment Services |

> These training sessions will be considered part of your weekly training. I, as your supervisor, will work with you to assign the dates and time periods for you to take these courses.

- During your training, daily briefings will be held at the beginning of each workday to discuss priorities for the day and status of work in progress.

...

- After the 15 day training period we will have bi-weekly meeting on Thursdays at 2:30 p.m. to discuss your work and you will be provided written feedback on your progress during the 90 days. ... If for any reasons I need to reschedule your bi-weekly meeting I will notify you and we can set a mutually agreed to date and time.

IAF1, Tab 10 at 30.

In the PIP, the agency promised extensive formal training, one-on-one supervisory assistance, written feedback, and bi-weekly meetings. With respect to training, the PIP contemplated that the first 15 days of the PIP was designed for re-training the appellant. IAF1, Tab 10 at 30. It was undisputed that the agency did not provide the formal training contemplated in the PIP.

In *Adorador*, 38 M.S.P.R. 461, the Board held that the employee did not receive a meaningful opportunity to improve because he did not receive the promised assistance of his supervisor during the early weeks of the performance improvement period. However, an agency does not fail to offer a meaningful opportunity to improve when it offers training to an employee, but those offers are declined. *See Towne*, 120 M.S.P.R. at 249–50, ¶¶ 19-20. The agency contends that the appellant refused the offered training. The appellant testified that she never rejected the training. Trans. 219. Because this material fact is disputed, I must resolve the dispute by making a credibility determination.

To resolve credibility issues, an administrative judge must identify the factual questions in dispute, summarize the evidence on each disputed question, state which version he believes, and explain in detail why he found the chosen version more credible, considering such factors as: (1) the witness's opportunity and capacity to observe the event or act in question; (2) the witness's character; (3) any prior inconsistent statement by the witness; (4) a witness's bias, or lack of

bias; (5) the contradiction of the witness's version of events by other evidence or its consistency with other evidence; (6) the inherent improbability of the witness's version of events; and (7) the witness's demeanor. *Hillen v. Department of the Army*, 35 M.S.P.R. 453, 458 (1987).

The agency relied upon Pannell's testimony, and notes made in the margin of the PIP document, to support its position that the appellant declined the offered training. The parties did not dispute that Pannell, Raymond, and the appellant participated in a meeting on October 5, 2016, to discuss the implementation of the PIP. Pannell claimed that the written PIP document was presented to the appellant and she objected to the training outlined in the document. Pannell testified that the appellant told her: "she did not want the training; she did not need the training; she knew her job; [and] she would not accept [the training]." Trans. at 23. Pannell explained that she made a hand-written note in the margin of the PIP indicating that the appellant had declined the offer of training. IAF1, Tab 10 at 29. The note reads: "10/5/16 Does not want trng Maintains she does not want anything." *Id.* (punctuation and grammar as in original).

The appellant relied upon her testimony and the testimony of Raymond to establish that she did not reject the offered training. The appellant testified that she never rejected the offered training. Trans. 219, 221. Specifically, in response to the question "...did you refuse the training as Ms. Pannell said" the appellant responded:

> No, I did not. Ms. Pannell said to me that I would have the training no matter what. I thought about it. And I said, yes, ma'am, I will do whatever you tell me to do when you tell me to do it. And I will be there. And [Pannell] said, you know, that she was going to do what was in the PIP.

*Id.* at 219. Raymond provided a slightly different version of events, claiming that the appellant initially rejected the idea of additional training, but changed her mind:

> When we started discussing the PIP and Ms. Pannell brought up training, [the appellant] did say that she wasn't interested in the training. She felt that she knew the job. But myself and Ms. Pannell talked to [the appellant] and convinced her to take the training. And she agreed.

*Id.* at 183.

Pannell, Raymond, and the appellant, all had equal capacity to observe the meeting because all three were present at the meeting where training was discussed. Therefore, the first *Hillen* factor does not make either version more credible than the other. The record also does not favor either party with respect to their character. I can find no prior inconsistent statements in the record from either party with respect to the disputed training issue. There is also no evidence to suggest that any of the parties have a particular bias, other than their particular vested interest in the outcome of the appeal, which the Board has held does not necessarily render testimony any less credible. *Hillen*, 35 M.S.P.R. at 460; *see Bennett v. Department of the Air Force*, 84 M.S.P.R. 132, ¶ 10 (1999).

I find that the agency's version of events is more consistent with the other record evidence. The PIP document shows that Pannell made several notations on the PIP document during the PIP meeting with Raymond and the appellant. For example, in addition to her note about training, she made a note in the margin that stated that, with respect to the appellant's observed performance deficiencies: "wanted this to be noted." IAF1, Tab 10 at 28. These notes, suggest that Pannell took contemporaneous notes on the PIP document during the PIP meeting. Pannell's note that the appellant declined the training in the PIP document is consistent with her sworn testimony.[12]

---

[12] The appellant and Raymond claimed that Pannell did not provide a copy of the PIP with these notations. Even if Pannell's copy of the PIP with her notes was not provided to the appellant or Raymond after this meeting, I find that it is still evidence that corroborates the appellant's rejection of the offered training. Inasmuch as the appellant claimed that the document was not authentic, or that the note was not contemporaneously made during the PIP meeting, this document was entered into the

The appellant claimed that, because the PIP was never amended—deleting the training—that it shows she did not reject the training.  Raymond testified that, normally, if something is taken out of a PIP, that a new PIP document would be produced.  While I agree that changing the PIP document would have resulted in a cleaner record, the appellant failed to explain why a hand-written note documenting her rejection was any less significant or effective in documenting the PIP.  In addition, it was undisputed that the appellant and Raymond met with Pannell two-weeks after the PIP started for the first PIP progress meeting.  There is no evidence that the appellant or Raymond raised any lack of training as an issue during this meeting.  Pannell's record of the meeting also does not indicate that this was raised as a concern.  IAF1, Tab 17, Subtab 4f, Part L2 (showing that the discussion involved her processing of specific cases).  This meeting was timed so that it occurred right as the training schedule would have been completed.  Therefore, the failure of the appellant or Raymond to raise the lack of training as an issue in this meeting is consistent with the agency's claim that she rejected the training.  *See generally* Trans. Appellant, Raymond (the appellant or Raymond did not claim that the agency's purported failure to follow through with training was ever raised with Pannell, or anyone in management, prior to her receiving notice of her failure to successfully perform under the PIP).  The record is devoid of any evidence that training, or the lack thereof, was ever an issue for the appellant until she was notified that she did not successfully perform under the PIP.  Therefore, I find the appellant's claim that she did not reject the offered training is inconsistent with the other record evidence.

The appellant also failed to explain, if she had not rejected the training, why she never raised this issue with management or her union representative prior to the end of the PIP.  Raymond testified that the appellant had no trouble

record of this appeal and the appellant offered no objection to it.  Moreover, any such claim was unsupported by any evidence.

seeking out union assistance, and that the appellant would raise issues with her and seek union help when she experienced problems in the workplace. Trans. at 185. However, after the first PIP progress meeting, the appellant never contacted the union again until she received notice of her unsuccessful performance at the end of the PIP. *Id.* Raymond viewed this as evidence that there were no issues with the PIP and that everything was going smoothly. Therefore, I also find it inherently implausible that, if the appellant did not reject the training, she, or her union representative, would not have raised this as an issue at some point prior to the agency's notice that she had failed to successfully perform during the PIP period.[13] Therefore, I find the appellant's claim that she did not reject the offered training is incredible.

I observed Pannell during her sworn testimony and, based upon her demeanor, I found her testimony credible. Pannell testified in a direct and clear manner, and I could detect no prevarication or evasion. Therefore, Pannell's demeanor also supports the conclusion that the appellant rejected the offered training. Moreover, the agency's burden of proof in this matter is substantial evidence. After weighing the appropriate *Hillen* factors, I find that the agency's claim that the appellant rejected the offered training in the PIP is more credible than the appellant's claims. I find that the appellant rejected the training offered in the PIP; as a result, I also find that the agency's failure to provide the training outlined in the PIP did not deny the appellant a meaningful opportunity to improve.

The appellant also claimed that the agency failed to provide her written feedback and only met with her once to discuss her progress during the PIP. The agency submitted evidence that Pannell provided the appellant feedback on a

---

[13] The appellant testified that she raised the training issue with Pannell; however, this testimony was conclusory and lacked any specificity as to this claim. The appellant offered no e-mails or other evidence that would tend to support this claim. Therefore, I afforded it little evidentiary weight.

regular basis when she talked to the appellant in person, or by telephone, to give her feedback on specific cases that she was assigned. IAF1, Tab 17, Subtab 4l. It also appears from the record that the first PIP meeting, where her union representative attended, was more formal than the remaining meetings during the PIP. The agency submitted written documentation of the cases, and specific guidance, Pannell provided to the appellant throughout the PIP. These discussions were memorialized in detailed notes taken by Pannell. *See* IAF1, Tab 17, Subtab 4f, Part L. Pannell testified that she met with appellant on a near daily basis, and would provide specific feedback as it related to her cases. Trans. 23-24.

Inasmuch as Pannell did not formally sit down for a face-to-face meeting every two weeks to discuss the appellant's performance, the Board has held that such formalized feedback is not required. An agency may meet its obligation to offer assistance by means other than meeting personally during the PIP. *Towne* 120 M.S.P.R. at 249, ¶ 20 (citing *Gjersvold*, 68 M.S.P.R. at 336). The written record shows that Pannell discussed the appellant's performance consistently throughout the PIP. Moreover, Pannell credibly testified that she discussed with the appellant deficiencies in her processing of specific cases, and that she offered her guidance and tips on how to effectively move cases and get them to the point where benefits could be awarded. This feedback was in the form of e-mail messages and meetings with the appellant. The appellant, under cross-examination, admitted that Pannell provided specific feedback regarding her cases. Trans. 237. Pannell explained, due to the nature of their work, that she would receive calls from veterans when the appellant failed to follow-up or complete tasks so that the veterans could receive benefits. She explained that she used these opportunities to instruct the appellant on the tasks required to move the case forward. IAF1, Tab 17, Subtab 4l. The agency also submitted e-mail messages that Pannell sent the appellant with respect to certain veterans' cases that were in need of additional work by her to deliver the requested benefits.

Moreover, I find credible Pannell's testimony that she offered additional practical advice, such as scheduling multiple veterans for meetings at one time, to the appellant during the PIP. This degree of assistance is greater than that which the Board has found sufficient to meet an agency's obligation to offer assistance. *See Goodwin*, 75 M.S.P.R. at 208–09 (the agency afforded the appellant a reasonable opportunity to improve where it gave her a detailed PIP letter and abundant written feedback during the PIP, and her supervisor made herself available to provide assistance but the appellant did not request further assistance); *Gjersvold*, 68 M.S.P.R. at 335–36 (the agency afforded the appellant a reasonable opportunity to improve where her supervisor provided her with 12 written evaluations during the PIP and solicited the appellant's questions and responses to the evaluations, which the appellant declined to provide). After considering the record as a whole, I find that the agency met its burden to show that it afforded the appellant a reasonable opportunity to improve her performance.

Based on the above, the agency established that the appellant's performance standards were valid, they were communicated to her, she was notified in advance of her performance deficiencies and provided a reasonable opportunity to improve, and at the end of the PIP her performance remained unacceptable for critical elements 1 and 5. Consequently, I find that the agency's charge of unacceptable performance is SUSTAINED.

## The appellant alleged affirmative defenses.

Although the reasons put forth by the agency for the appellant's removal were sustained, the agency's action may not be upheld if the appellant shows that the decision was based on a prohibited personnel practice. 5 U.S.C. § 7701(c)(2)(B). The appellant claimed that the agency's action was based upon her disability (failure to accommodate), and retaliation for EEO activity. Discrimination or retaliation on these bases are prohibited personnel

practices under 5 U.S.C. § 2302. The appellant also alleged that the agency committed a harmful error in her removal.

<u>The appellant failed to establish the agency discriminated against her because of her disability (failure to accommodate).</u>

As a Federal employee, the appellant's disability discrimination claims arise under the Rehabilitation Act of 1973. *Simpson v. U.S. Postal Service*, 113 M.S.P.R. 346, ¶ 8 (2010). However, the Equal Employment Opportunity Commission (EEOC) regulations implementing the Americans with Disabilities Act, as amended by the ADAAA, have been incorporated by reference into the Rehabilitation Act, and the Board applies them to determine whether there has been a Rehabilitation Act violation. *Thome v. Department of Homeland Security*, 122 M.S.P.R. 315, ¶ 23 (2015); 29 C.F.R. § 1614.203(b).

To prove disability discrimination, the appellant must first prove that she is an individual with a disability as the term is defined in the ADAAA and the EEOC regulations. *Thome*, 122 M.S.P.R. 315, ¶ 24 (citing *Doe v. Pension Benefit Guaranty Corporation*, 117 M.S.P.R. 579, ¶ 38 (2012)). The appellant may establish that she has a disability by showing that she: (1) has a physical or mental impairment that substantially limits one or more major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment. 42 U.S.C. § 12102(1), 29 C.F.R. § 1630.2(g)(1),(2),(3). The definition of disability is construed in favor of broad coverage. 42 U.S.C. § 12102(4)(A).

A physical or mental impairment is any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, or any mental or psychological disorder. 29 C.F.R. § 1630.2(h). The test for whether a disability substantially limits the ability of an individual to perform a major life activity is applied as compared to most people in the general population. 29 C.F.R. § 1630.2(j)(1)(ii). Major life activities include but are not

limited to activities such as caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working. 29 C.F.R. § 1630.2(i).

The appellant produced no medical evidence to support the fact she had a disability. I issued an affirmative defense order in this appeal, and I explained in detail the burden of proof and the facts that the appellant had to prove to establish her claim of discrimination. The appellant produced only conclusory statements by her representative in response to that order. *E.g. Hendricks v. Department of the Navy*, 69 M.S.P.R. 163, 168 (1995) (holding that a statement of a party's representative in a pleading is not evidence before the Board). Moreover, her testimony at hearing was vague and non-specific as it related to any purported disabilities. *See* Trans. The appellant claimed that she had a problem with her hands, that she had a knot on her hand and it required her to wear a brace.[14] The appellant also claimed that she has a mental disability, and that she has experienced a panic attack. However, there is no medical evidence or direct testimony that she has ever been diagnosed with a mental health condition. Moreover, even if crediting her conclusory testimony, the appellant failed to explain how she was limited in a major life activity with respect to her purported physical and mental disability. Even though the Board is required to construe the definition of disability in favor of broad coverage, I find that the appellant failed to meet it here.[15] *See* 42 U.S.C. § 12102(4)(A); *see also* 29 C.F.R. §

---

[14] Moreover, the appellant testified that she had surgery on her hand in 2014 to address the knot. Trans. 203. The surgery occurred well before the PIP, and it is unclear from the record, even if the appellant's hand condition was disability limiting a major life activity, that it continued to exist after her surgery. The appellant claimed that the surgery left a scar, which she would prefer not to have, but failed to explain any continuing limitation on a major life activity. *See id.*

[15] Inasmuch as the appellant presented sufficient evidence to establish she was disabled, and entitled to an accommodation, I find that the appellant failed to identify any

1630.2(j)(1)(i) (the term "substantially limits" is construed broadly in favor of expansive coverage and is not meant to be a demanding standard).

It appears the agency regarded the appellant as disabled, and the record shows that the agency provided her workplace modifications, and specialized "*Dragonspeak*" software which converted her to talk to text for her word processing duties at the agency. In addition, the appellant's transfer from Ft. Polk to New Orleans, LA, was in part to allow her to be closer to adequate medical treatment options. Pannell testified that she "knew the appellant had disabilities" when she started working for her. Therefore, I find that the appellant established that she is "disabled" within the meaning of 29 C.F.R. § 1630.2(g)(1)(i), in that the agency regarded her as an individual with a disability. However, an appellant who has only established disability under the "regarded as" prong of the definition is not entitled to a reasonable accommodation under the ADAAA. *Alford v. Department of Defense*, 118 M.S.P.R. 556, ¶ 10, n. 6 (2012). Therefore, the appellant's failure to accommodate claim fails.

### The appellant failed to establish that the agency removed her for retaliation for EEO activity.

The analytical framework set forth in *Savage v. Department of the Army*, 122 M.S.P.R. 612, ¶ 51 (2015), is applied to claims of EEO retaliation raised

---

accommodation that would have allowed her to meet the requirements of the position, and allow her to achieve fully successful performance. *See Henson v. U.S. Postal Service*, 110 M.S.P.R. 624, ¶ 7 (2009) (citation omitted). The appellant failed to establish that she was a "qualified" individual with a disability, in that she failed to show that she was able to perform the essential duties of the position with or without a reasonable accommodation. 29 C.F.R. § 1630.9(m). The agency's obligation to provide reasonable accommodation to the employee only arises when the employee has established her status as a qualified disabled employee. In this appeal, the appellant made general claims that the agency had failed to provide her an ergonomic assessment, and that it had failed to provide her workplace accommodations that she had at Ft. Polk. However, she failed to explain what the agency failed to provide which would have allowed her to improve her performance beyond what was achieved during the PIP.

before the Board. Pursuant to *Savage*, when determining if prohibited retaliation requires reversal of the contested personnel action, the Board applies a two-step analysis. First, the appellant must meet her initial burden by preponderant evidence that the prohibited retaliation was a motivating factor in the contested personnel action, in violation of 42 U.S.C. § 2000e-16. Such a showing is sufficient to establish that the agency violated 42 U.S.C. § 2000e–16, thereby committing a prohibited personnel practice under 5 U.S.C. § 2302(b)(1). *Sabio v. Department of Veterans Affairs*, 124 M.S.P.R. 161, ¶ 35 (2017). Next, if the appellant met her initial burden, and established that the prohibited retaliation was a motivating factor in the contested personnel action, then the Board will inquire whether the agency has shown by preponderant evidence that it still would have taken the contested action in the absence of the discriminatory or retaliatory motive. *Savage*, 122 M.S.P.R. 612, ¶¶ 49-51. If the agency meets that burden, its violation will not require reversal of the action. *Id.*, ¶ 51.

When determining whether the appellant has met her initial burden to show a motivating factor, the Board must consider all of the evidence of retaliation together as a whole, without sorting evidence into different piles labeled "direct" or "indirect" that are evaluated differently. *Sabio*, 124 M.S.P.R. 161, ¶ 36; *Gardner v. Department of Veterans Affairs*, 123 M.S.P.R. 647, ¶ 29 (2016) (finding that *Savage* does not require an administrative judge to separate direct or indirect evidence and an appellant is not required to demonstrate a "convincing mosaic" of discrimination or retaliation to meet his burden of contributing factor).

It was undisputed that the appellant had several EEO claims pending at the time the agency placed her on the PIP. It appears that the discovery phase of litigation occurred around the same time as the PIP, wherein the appellant had deposed agency officials in July and August of 2016. The appellant, however, failed to produce any additional evidence that the agency was motivated by her EEO activity to remove her. There is no evidence that the appellant was

. .

disparaged through e-mail or other communications related to her EEO activity.[16] There is no evidence or allegation that the agency failed to take her EEO claims seriously.    There is no evidence that the agency's analysis of her failing performance before placing her on the PIP, or during the PIP, was pretext for retaliation. As explained above, the appellant did not claim, nor did she provide any evidence that her performance before the PIP, or during the PIP, was successful. She failed to produce evidence that similarly situated employees with failing performance, who were not engaged in EEO activity, were not placed on a PIP or other corrective action with respect to their performance. Close temporal proximity between her protected EEO activity and the agency's action, standing alone, is insufficient to establish that the agency was motivated to retaliate against the appellant based upon her protected activity.

The appellant failed to establish the agency committed harmful error.

The agency's action may not be upheld if the appellant shows that the agency committed harmful error in reaching the decision to remove her. 5 U.S.C. § 7701(c)(2)(A). Harmful error is error by the agency in the application of its procedures that is likely to have caused the agency to reach a conclusion different

---

[16] The appellant claims that the agency was hostile towards her requested reasonable accommodation transfer to the agency's office in Mobile, AL.  IAF2, Tab 6.    The appellant's representative claimed that the agency only met with the appellant one time to discuss her reasonable accommodation request, and that her requested transfer to Mobile was "cancelled" after she was transferred to New Orleans. Based on the above analysis, it does not appear that the agency acted inappropriately when it failed to engage her further in her accommodation requests, in that, at least in this appeal, she failed to establish that she has a disability that the agency must accommodate. It is also well established that the appellant is not entitled to the accommodation of her choice. It appears the appellant sought a transfer to be closer to adequate medical care for her medical conditions. The appellant failed to explain how a transfer to Mobile, AL, was required for her treatment, and how a transfer to the major metropolitan area of New Orleans, LA, was any less effective in providing her adequate treatment options for any disabilities she may have. Therefore, I find that the agency's actions with respect to any requested transfer to Mobile are entitled to little probative weight with respect to the appellant's claim that the agency retaliated against her for protected EEO activity.

from the one it would have reached in the absence or cure of the error. 5 C.F.R. § 1201.4(r) (2018).

The appellant claimed the agency failed to follow its work assignment policy for employees on leave. IAF2, Tab 10 at 5. The appellant did not specifically set forth the policy she alleged the agency violated, and she did not submit the policy in the record of this appeal. Therefore, it is unclear how the agency failed to follow this purported policy or how it would have resulted in a different outcome in the agency's action.

Based on the testimony in this appeal, it also appears the appellant may have claimed that the PIP was not conducted in accord with the applicable collective bargaining agreement (CBA).[17] *See* Trans. Raymond; *Warren v. Department of Defense*, 87 M.S.P.R. 426, ¶ 10 (2001) (violations of collective bargaining agreements are analyzed under the harmful error doctrine). However, the appellant failed to introduce the CBA as evidence, and she failed to identify the specific provision that the agency purportedly violated. *Hernandez v. Department of the Air Force*, 9 M.S.P.R. 12, 13 (1981) (finding that employee's failure to introduce into evidence a union agreement allegedly violated by the agency warranted conclusion that employee failed to meet burden of proof as to that affirmative defense). Moreover, even if I could discern from the whole cloth which provisions of the CBA that the appellant claimed the agency violated, the appellant failed to meet her burden to establish how these alleged violations would have led to a different conclusion in this matter. Consequently, the appellant's claim of harmful error also fails.

---

[17] The appellant also claimed that the agency's alleged failure to follow the procedures set forth in the PIP was harmful procedural error. IAF2, Tab 10 at 5. However, this claim goes to the merits of the agency's action, as set forth above, and is not an affirmative defense.

Conclusion

Based on the foregoing, I find that the agency produced substantial evidence to support its action under chapter 43. The Board is without authority to mitigate the penalty in performance based actions such as this. Therefore, the agency's action must be AFFIRMED.

## DECISION

The agency's action is AFFIRMED.

FOR THE BOARD:                          /S/_____
                                        Patrick J. Mehan
                                        Administrative Judge

### NOTICE TO APPELLANT

This initial decision will become final on **November 26, 2018**, unless a petition for review is filed by that date. This is an important date because it is usually the last day on which you can file a petition for review with the Board. However, if you prove that you received this initial decision more than 5 days after the date of issuance, you may file a petition for review within 30 days after the date you actually receive the initial decision. If you are represented, the 30-day period begins to run upon either your receipt of the initial decision or its receipt by your representative, whichever comes first. You must establish the date on which you or your representative received it. The date on which the initial decision becomes final also controls when you can file a petition for review with one of the authorities discussed in the "Notice of Appeal Rights" section, below. The paragraphs that follow tell you how and when to file with the Board or one of those authorities. These instructions are important because if you wish to file a petition, you must file it within the proper time period.

## BOARD REVIEW

You may request Board review of this initial decision by filing a petition for review.

If the other party has already filed a timely petition for review, you may file a cross petition for review. Your petition or cross petition for review must state your objections to the initial decision, supported by references to applicable laws, regulations, and the record. You must file it with:

The Clerk of the Board
Merit Systems Protection Board
1615 M Street, NW.
Washington, DC 20419

A petition or cross petition for review may be filed by mail, facsimile (fax), personal or commercial delivery, or electronic filing. A petition submitted by electronic filing must comply with the requirements of 5 C.F.R. § 1201.14, and may only be accomplished at the Board's e-Appeal website (https://e-appeal.mspb.gov).

## NOTICE OF LACK OF QUORUM

The Merit Systems Protection Board ordinarily is composed of three members, 5 U.S.C. § 1201, but currently only one member is in place. Because a majority vote of the Board is required to decide a case, *see* 5 C.F.R. § 1200.3(a), (e), the Board is unable to issue decisions on petitions for review filed with it at this time. *See* 5 U.S.C. § 1203. Thus, while parties may continue to file petitions for review during this period, no decisions will be issued until at least one additional member is appointed by the President and confirmed by the Senate. The lack of a quorum does not serve to extend the time limit for filing a petition or cross petition. Any party who files such a petition must comply with the time limits specified herein.

For alternative review options, please consult the section below titled "Notice of Appeal Rights," which sets forth other review options.

## Criteria for Granting a Petition or Cross Petition for Review

Pursuant to 5 C.F.R. § 1201.115, the Board normally will consider only issues raised in a timely filed petition or cross petition for review. Situations in which the Board may grant a petition or cross petition for review include, but are not limited to, a showing that:

(a) The initial decision contains erroneous findings of material fact. (1) Any alleged factual error must be material, meaning of sufficient weight to warrant an outcome different from that of the initial decision. (2) A petitioner who alleges that the judge made erroneous findings of material fact must explain why the challenged factual determination is incorrect and identify specific evidence in the record that demonstrates the error. In reviewing a claim of an erroneous finding of fact, the Board will give deference to an administrative judge's credibility determinations when they are based, explicitly or implicitly, on the observation of the demeanor of witnesses testifying at a hearing.

(b) The initial decision is based on an erroneous interpretation of statute or regulation or the erroneous application of the law to the facts of the case. The petitioner must explain how the error affected the outcome of the case.

(c) The judge's rulings during either the course of the appeal or the initial decision were not consistent with required procedures or involved an abuse of discretion, and the resulting error affected the outcome of the case.

(d) New and material evidence or legal argument is available that, despite the petitioner's due diligence, was not available when the record closed. To constitute new evidence, the information contained in the documents, not just the documents themselves, must have been unavailable despite due diligence when the record closed.

As stated in 5 C.F.R. § 1201.114(h), a petition for review, a cross petition for review, or a response to a petition for review, whether computer generated, typed, or handwritten, is limited to 30 pages or 7500 words, whichever is less. A

reply to a response to a petition for review is limited to 15 pages or 3750 words, whichever is less. Computer generated and typed pleadings must use no less than 12 point typeface and 1-inch margins and must be double spaced and only use one side of a page. The length limitation is exclusive of any table of contents, table of authorities, attachments, and certificate of service. A request for leave to file a pleading that exceeds the limitations prescribed in this paragraph must be received by the Clerk of the Board at least 3 days before the filing deadline. Such requests must give the reasons for a waiver as well as the desired length of the pleading and are granted only in exceptional circumstances. The page and word limits set forth above are maximum limits. Parties are not expected or required to submit pleadings of the maximum length. Typically, a well-written petition for review is between 5 and 10 pages long.

If you file a petition or cross petition for review, the Board will obtain the record in your case from the administrative judge and you should not submit anything to the Board that is already part of the record. A petition for review must be filed with the Clerk of the Board no later than the date this initial decision becomes final, or if this initial decision is received by you or your representative more than 5 days after the date of issuance, 30 days after the date you or your representative actually received the initial decision, whichever was first. If you claim that you and your representative both received this decision more than 5 days after its issuance, you have the burden to prove to the Board the earlier date of receipt. You must also show that any delay in receiving the initial decision was not due to the deliberate evasion of receipt. You may meet your burden by filing evidence and argument, sworn or under penalty of perjury (*see* 5 C.F.R. Part 1201, Appendix 4) to support your claim. The date of filing by mail is determined by the postmark date. The date of filing by fax or by electronic filing is the date of submission. The date of filing by personal delivery is the date on which the Board receives the document. The date of filing by commercial delivery is the date the document was delivered to the commercial delivery

service.  Your petition may be rejected and returned to you if you fail to provide a statement of how you served your petition on the other party.  *See* 5 C.F.R. § 1201.4(j).  If the petition is filed electronically, the online process itself will serve the petition on other e-filers.  *See* 5 C.F.R. § 1201.14(j)(1).

A cross petition for review must be filed within 25 days after the date of service of the petition for review.

## NOTICE TO AGENCY/INTERVENOR

The agency or intervenor may file a petition for review of this initial decision in accordance with the Board's regulations.

## NOTICE OF APPEAL RIGHTS

You may obtain review of this initial decision only after it becomes final, as explained in the "Notice to Appellant" section above.  5 U.S.C. § 7703(a)(1). By statute, the nature of your claims determines the time limit for seeking such review and the appropriate forum with which to file.   5 U.S.C. § 7703(b). Although we offer the following summary of available appeal rights, the Merit Systems Protection Board does not provide legal advice on which option is most appropriate for your situation and the rights described below do not represent a statement of how courts will rule regarding which cases fall within their jurisdiction.  If you wish to seek review of this decision when it becomes final, you should immediately review the law applicable to your claims and carefully follow all filing time limits and requirements.   Failure to file within the applicable time limit may result in the dismissal of your case by your chosen forum.

Please read carefully each of the three main possible choices of review below to decide which one applies to your particular case.  If you have questions about whether a particular forum is the appropriate one to review your case, you should contact that forum for more information.

. .

(1) **Judicial review in general**.  As a general rule, an appellant seeking judicial review of a final Board order must file a petition for review with the U.S. Court of Appeals for the Federal Circuit, which must be <u>received</u> by the court within **60 calendar days** of <u>the date this decision becomes final</u>.   5 U.S.C. § 7703(b)(1)(A).

If you submit a petition for review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C.  20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov.  Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit.  The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

(2) **Judicial or EEOC review of cases involving a claim of discrimination**.  This option applies to you <u>only</u> if you have claimed that you were affected by an action that is appealable to the Board and that such action was based, in whole or in part, on unlawful discrimination. If so, you may obtain judicial review of this decision—<u>including a disposition of your discrimination claims</u>—by filing a civil action with an appropriate U.S. district court (*not* the U.S. Court of Appeals for the Federal Circuit), within **30 calendar days** <u>after this</u>

decision becomes final under the rules set out in the Notice to Appellant section, above.   5 U.S.C. § 7703(b)(2); *see Perry v. Merit Systems Protection Board*, 582 U.S. ____ , 137 S. Ct. 1975 (2017). If the action involves a claim of discrimination based on race, color, religion, sex, national origin, or a disabling condition, you may be entitled to representation by a court-appointed lawyer and to waiver of any requirement of prepayment of fees, costs, or other security. *See* 42 U.S.C. § 2000e-5(f) and 29 U.S.C. § 794a.

Contact information for U.S. district courts can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

Alternatively, you may request review by the Equal Employment Opportunity Commission (EEOC) of your discrimination claims only, excluding all other issues.  5 U.S.C. § 7702(b)(1).  You must file any such request with the EEOC's Office of Federal Operations within **30 calendar days** after this decision becomes final as explained above.  5 U.S.C. § 7702(b)(1).

If you submit a request for review to the EEOC by regular U.S. mail, the address of the EEOC is:

Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 77960
Washington, D.C.  20013

If you submit a request for review to the EEOC via commercial delivery or by a method requiring a signature, it must be addressed to:

Office of Federal Operations
Equal Employment Opportunity Commission
131 M Street, N.E.
Suite 5SW12G
Washington, D.C.  20507

**(3) Judicial   review   pursuant   to   the   Whistleblower   Protection Enhancement Act of 2012**.  This option applies to you only if you have raised claims of reprisal for whistleblowing disclosures under 5 U.S.C. § 2302(b)(8) or

other protected activities listed in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D). If so, and you wish to challenge the Board's rulings on your whistleblower claims only, excluding all other issues, then you may file a petition for judicial review with the U.S. Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction.   The court of appeals must receive your petition for review within **60 days** of the date this decision becomes final under the rules set out in the Notice to Appellant section, above. 5 U.S.C. § 7703(b)(1)(B).

If you submit a petition for judicial review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

> U.S. Court of Appeals
> for the Federal Circuit
> 717 Madison Place, N.W.
> Washington, D.C.  20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov.  Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit.  The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

Contact information for the courts of appeals can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx